### Virginia Coupon Cases.[1]

#### Norfolk Trust Co. *v.* Marye, Auditor, etc.

(*Circuit Court, E. D. Virginia.* December, 1885.)

1. State and State Officers—Action to Obtain Obedience to State Law.
   The suit of a citizen against an officer of a state to obtain obedience to a law of the state, is not a suit against the state. And this is so, even though the state be as directly interested in the result of the suit as if she were the defendant of record.

2. Same—Jurisdiction of Circuit Courts—State a Party to Suit.
   It is no objection to the jurisdiction of the circuit courts of the United States, in cases arising under the constitution and laws of the United States, that one of the parties is a state and the other a citizen of that state.

3. Virginia Coupons—Verification—Injunction.
   The act of Virginia of January 14, 1882, "to prevent frauds upon the commonwealth," etc., which provides a mode of verifying the genuineness of tax-receivable coupons offered in payment of taxes, must be observed and pursued by her tax-receiving officers. This act puts the initiative upon the receiver of taxes for the judicial verification of coupons; and if this officer neglects to perform the initiatory duties required by the act, there is no mode by which the tax-payer can obtain a judicial verification of his coupons. If, when the tax-payer tenders coupons in payment of his taxes, the tax-receiver refuses to receive them, and fails otherwise to comply with sections 1, 2, 3 of the said act, then, under the decision in *Poindexter* v. *Greenhow,* 114 U. S. 270, S. C. 5 Sup. Ct. Rep. 903, the tender of coupons by the tax-payer is payment of the tax, and the court will enjoin against a levy for the taxes and against declaring the tax-payer a delinquent.

[1] See note at end of case.

**4. SAME—MANDATORY INJUNCTIONS.**
The decision of the supreme court in *Marye* v. *Parsons*, 114 U. S. 325, S. C. 5 Sup. Ct. Rep. 932, 962, does not bring in question, or affect the validity of, the mandatory injunction, as known to the English and American chancery jurisdiction for centuries.

Injunction in Equity.

*R. L. Maury* and *White & Garnett*, for complainant.

*F. S. Blair*, Atty. Gen., for defendant.

HUGHES, J. The complainant corporation was chartered by Virginia, and is a citizen of Virginia, doing a banking business in the city of Norfolk. It was assessed by defendant in April last with back taxes for the years 1874, 1877, 1879, 1880, 1881, and 1882, to the amount of $817.80. On the eighteenth of May, it tendered the amount of the assessment to the defendant, who is auditor of public accounts, in coupons (except a few cents.) The coupons tendered are described by dates and numbers in complainant's bill, and were cut, part of them from bonds issued under the funding act of 1871, and part under that of 1879. The auditor, Mr. Marye, refused to receive the coupons so tendered. The bill avers that after the refusal a further demand was made upon the complainant by the defendant for the taxes, and that defendant informed complainant's agent that unless the same were paid at once, proceedings would be taken to enforce payment as provided by law against delinquent tax-payers. The bill further avers that when the coupons were so tendered and refused, the defendant declared that if the right to pay these taxes in coupons should be insisted upon, he would prepare a new bill for the taxes, for a much greater amount, which should include whatever fines, interest, and penalties the laws of the state inflicted upon delinquent tax-payers, and would proceed to enforce payment by suit or levy. There are other important averments in the bill, which, though material, do not affect the principles on which the case must be decided. The bill prays, among other things, for an injunction to restrain defendant, his officers and agents, from making any further assessments against complainant as threatened; from refusing to accept the said coupons in payment of the taxes mentioned, and to give receipts therefor; and for other enumerated relief.

The defendant, by the attorney general, filed a demurrer and answer to the bill in due course of practice. These contain no specific denial of the allegations of the bill; and the case was submitted by counsel on both sides in August last, on printed arguments.

By consent of counsel I have withheld a decision in the case until now. It was the first case that came before me after the decisions of the supreme court of the United States in the Virginia cases, rendered in April last, and is the first case affected by those decisions on which I have acted. The demurrer and answer of defendant rests his case upon three grounds of defense, viz.: that (1) this is a suit against the state of Virginia herself, and therefore cannot be entertained by the court; (2) before the tender of the coupons named in

the bill, they had not been ascertained to be genuine as required by the act of assembly of January 14, 1882; and (3) the bill, though in form an injunction, is in effect a *mandamus;* and therefore is governed by the late decision of the supreme court of the United States in the case of *Marye* v. *Parsons,* 114 U. S. 325; S. C. 5 Sup. Ct. Rep. 932, 962, and ought to be dismissed.

I will consider these grounds of defense in their order.

1. The suit of a citizen against an officer of his state, to require obedience to a law of his state, is held by the supreme court of the United States not to be a suit against the state herself. If it were, then, that court says in substance, officers would have impunity to administer office according to their own caprice, or convenience, or in their personal interest. That court insists that reason and authority unite to reject such a proposition. It insists that it is not competent for any officer of the republic to assert with Louis XIV, the mediæval autocrat of France, *l'etat c'est moi,* and, under the prerogative of office, to justify a violation of the law of the people, enrolled in the statute book, which he is intrusted to administer. It declares virtually that the officer does not so reflect the *vera effigies,* embody the dignity, or impersonate the sovereignty of the state, that she is insulted when his conduct is brought under judicial inquiry, at the suit of a citizen every whit his equal. It is true that the decision of the supreme court to this effect in the Virginia cases heard at the last term was accompanied by an imposing dissent; but that fact only emphasizes the ruling of the court, and rivets it more firmly as the law of the land. It is in settling doubtful questions that the decisions of a court of highest resort have their special and greatest value.

The fact that, as in the present case, the state has a collateral interest in the result of the suit does not affect the proposition under consideration. A citizen who is injured by an officer by the denial of a right conferred by law, may at any time bring that officer before a court of justice to test the legality of his action, whether he personally, or the state for whom he acts, is to be gainer from his conduct. Such gain is but an incident of the matter, which cannot affect the right of the injured citizen to sue the immediate perpetrator of the injury. And therefore the defendant's first ground of defense cannot avail him. Even admitting, however, for the sake of argument, that the complainant, by seeking in this suit to pay taxes in what the state has made money for that especial purpose, rather than in the money used for all purposes, really and practically sues the state herself,—still this suit may be entertained by this court. It is a mere truism to say that a suit will lie against a state in all cases in which she has granted the right to bring it; and it is equally true that it will not lie in any other cases whatever. *Cela va sans dire.* The simple question, therefore, is whether the states of this Union have granted to the federal courts jurisdiction of suits brought by

their own citizens against themselves, in cases in which the states have violated a constitutional right of the plaintiff. Chief Justice MARSHALL said:

"That a sovereign state is not suable except by its own consent, is a general proposition which will not be controverted. But its consent is not requisite in each particular case. It may be given in a general law. And, if a state has surrendered any portion of its sovereignty, the question whether a liability to suit be a part of this portion depends on the instrument by which the surrender is made. If, upon a just construction of that instrument, it shall appear that the state has submitted to be sued, then it has parted with this sovereign right of judging in every case on the justice of its own pretensions, and has entrusted that power to a tribunal in whose impartiality it confides." *Cohens* v. *Virginia,* 6 Wheat. 380.

The eleventh amendment of the national constitution does not affect this question. That article refers only to non-residents and aliens; forbidding only such suits as are "prosecuted against one of the states by citizens of another state, or by citizens or subjects of a foreign state." The citizen of New York cannot sue the state of Virginia in a federal court. The subject of the British crown cannot sue her. This is as far as the eleventh amendment goes. It does not forbid the citizen of Virginia from suing his own state for a violation of a constitutional right. It is silent as to such a citizen. The constitution of the United States is a grant of powers from the states; chief among whom, at the time of its ratification, was Virginia. It is a grant of powers from the state of Virginia to the national government, one branch of which consists of the federal courts. In respect to the jurisdiction of these courts, the grant is in two classes of cases. One of these has reference only to the parties to suits. If the parties be as described, the jurisdiction attaches, whatever be the cause of action. The other class of cases has reference only to the cause of action; if this be as defined, the jurisdiction exists as to all parties whatever, except those expressly named by the eleventh amendment. *Cohens* v. *Virginia,* 6 Wheat. 378. The grant in respect to the cause of action is in the clause of the second section of article third, which extends the jurisdiction of the federal courts to "all cases in law and equity arising under this constitution, the laws of the United States, and treaties made under their authority;" that is to say, to all cases involving what is called a "federal question."

Language could not be more comprehensive than this; and so, when a state passes a law impairing the obligation of a contract, which the national constitution expressly forbids, and one of her own citizens is injured thereby, his case "arises under the constitution," and belongs to the jurisdiction which attaches with reference to the cause of action. The jurisdictional provisions of the constitution do not in general, however, act *proprio vigore.* They require to be put in force by the agency of congress. The clauses defining the judicial power, except those confering original jurisdiction upon the supreme court, would be a dead letter if not vitalized by congressional statute. As

to the supreme court, the jurisdiction arising from the nature of the cause of action without reference to parties was put in force by the twenty-fifth section of the judiciary act of 1789, and stands now as section 709 in the Revised Statutes of the United States.

As to the circuit courts, this jurisdiction was never brought into exercise by congress until the passage of the judiciary act of March 3, 1875, which conferred it upon them in all cases in law and equity, arising under the constitution and laws of the United States, when the matter in dispute exceeds the value of five hundred dollars. Under section 709 of the Revised Statutes, a citizen may bring an appellate suit in the supreme court of the United States against his own state to reverse a judgment which she has recovered against him even in her own court of highest resort. Similarly, now, under the first section of the judiciary act of 1875, the citizen may bring an original suit against his own state in a federal circuit court to redress an injury which she has inflicted upon him by a violation of the constitution or a law of the United States.

It is true that the dissenting justices in the Virginia cases, decided in April last by the supreme court, say on this subject, among other things; "It would be very strange to say that, although a state cannot in any case be sued by a citizen of another state since the adoption of the eleventh amendment, yet, in a case arising under the constitution and laws of the United States, it may be sued by its own citizens. This would be to deprive a state, with regard to its own citizens, of its sovereign right of exemption from suit. It seems to us that the absurdity of this proposition is its own sufficient answer." None will question the dignity of the source from which this utterance comes, or the weight of the objection so imposingly presented to the jurisdiction in question. Yet, this precise point had been considered and unanimously discarded by the supreme court itself, in a decision rendered by Chief Justice MARSHALL, in 1821, 23 years after the adoption of the eleventh amendment. Two citizens of Virginia had brought an appellate proceeding in the supreme court of the United States against the state, to set aside a judgment which she had recovered against them in one of her courts—in that case the court of last resort. The syllabus of the decision of the supreme court in the case contains the following clause: "It is no objection to the exercise of the appellate jurisdiction of this court, in this case, that one of the parties is a state, and the other a citizen of the state."

In considering the point of objection now urged anew, Judge MARSHALL said:

"It has been also urged, as an additional objection to the jurisdiction of the court, that cases between the state and one of its own citizens do not come within the general scope of the constitution; and were obviously never intended to be made cognizable in the federal courts. * * * This is very true, so far as jurisdiction depends upon the character of parties. * * * If jurisdiction depended entirely on the character of parties, and was not given where the parties had not an original right to come into court, that

part of the second section of the third article which extends the judicial power to all cases arising under the constitution and laws of the United States would be mere surplusage. It is to give jurisdiction where the character of the parties would not give it, that this very important part of the clause was inserted. If the constitution or laws may be violated by proceedings instituted by a state against its own citizens, and if that violation may be such as essentially to affect the constitution and the laws, * * * why should these cases be excepted from that provision which expressly extends the judicial power of the Union to *all* cases arising under the constitution and laws? After bestowing on this subject the most attentive consideration, the court can perceive no reason, founded on the character of the parties, for introducing an exception which the constitution has not made; and we think that the judicial power, as originally given, extends to all cases arising under the constitution or a law of the United States, whoever may be the parties." See *Cohens* v. *Virginia*, 6 Wheat. 265–448; especially at pages, 378, 390, 391.

After the passage of the judiciary act of 1875, precisely the same question arose as to the jurisdiction of the circuit courts of the United States, and this point, among others, was considered by the supreme court in the case of *Ames* v. *Kansas*, 111 U. S. 449; S. C. 4 Sup. Ct. Rep. 437. That was a removed case, in which a corporation of Kansas brought its own state into a federal circuit court, by petition for removal. One of the principal questions was whether a citizen could thus sue its own state in a federal circuit court. The circuit court refused to entertain the suit and it went to the supreme court, where the opinion was delivered by Chief Justice WAITE, who quoted on this point the language of Chief Justice Marshall in *Cohens* v. *Virginia*, and adopted it and applied it in support of the newly-conferred jurisdiction of the circuit courts of the United States. I infer, from the hesitating language of the chief justice, that it was with great reluctance that the supreme court conceded to the circuit courts the jurisdiction in this respect, which the act of 1875 unqualifiedly confers upon them.

As the legislation of congress and decisions of the supreme court now stand, therefore, the clause of the syllabus in *Cohens* v. *Virginia* relating to this subject must be enlarged as follows to express the present condition of the law:

"It is no objection to the jurisdiction of the supreme and circuit courts of the United States, in cases arising under the constitution and laws of the United States, that one of the parties is a state, and the other a citizen of that state."

It is true that Alexander Hamilton, in letter 81 of the *Federalist*, expressed the opinion in a digressive paragraph that "the state governments would not, by the adoption of the [National Constitution], be divested of the privilege of paying their own debts in their own way, free from every constraint but that which flows from the obligations of good faith." This opinion was entirely correct as to those obligations of the states, to the payment of which they, in the terms then in vogue, merely "pledged their faith;" and was practically concurred in for 60 years. It was not until after some of the states, notably

Arkansas, as shown in the case of *Woodruff* v. *Trapnall*, 10 How. 190, voluntarily began the baleful practice of putting their obligations in the form of self-executing contracts, such as the national constitution contemplates in forbidding them to pass laws impairing the obligation of contracts, that Mr. Hamilton's opinion, good as to "pledges of faith," ceased to prevail as to "self-executing contracts." It was then found in regard to these *contracts*, as had been declared by Judge MARSHALL, that power was given the federal judiciary over them as "arising under the constitution and laws of the United States," whoever might be the parties to the suits brought upon them. So, likewise, as to these *contracts*, the congress of 1875 disregarded Mr. Hamilton's view in conferring upon the circuit courts of the United States jurisdiction in all cases arising under the Constitution and laws of the United States, in which the matter in controversy exceeds the value of $500, subject only to the limitations of the eleventh amendment.

On this subject of the jurisdiction of suits against states, the justices of the supreme court have usually been very nearly divided. In *Cohens* v. *Virginia*, where two citizens brought suit against their own state, and the suit was entertained, the justices were unanimous. But in *Woodruff* v. *Trapnall*, 10 How. 190, where a citizen brought suit against his own state, in the person of her attorney general, which was the case which suggested, and from which originated the tax-receivable coupon, the court entertained the suit, five to four. In the case decided last April of *Allen* v. *Baltimore & O. R. Co.*, 114 U. S. 311, S. C. 5 Sup. Ct. Rep. 925, 962, in which a non-resident corporation sued a state in the person of its revenue officer, and in which I had refused to entertain jurisdiction below, the suit was entertained, five to four. In the *Arlington Case*, where the question was between a citizen and the United States, the court entertained the suit, five to four.

Fear is expressed of the usurpation of power by the federal courts. The fear is groundless. Their jurisdiction is almost wholly derived from congress, the direct representative of the popular will. As to the circuit and district courts, not only is all their power, but the courts themselves are of statutory creation. Congress exclusively establishes their jurisdiction. Its breath can unmake as its breath has made it. As to the supreme court, it is only in cases "affecting ambassadors, other public ministers and consuls, and those in which a state is a party," that it has original jurisdiction independently of congress. In all other cases its jurisdiction is appellate, and such only as may be conferred by the legislative branch of the government. And, therefore, if too much power has been conferred upon the federal courts, the remedy is not in expecting their judges to forswear themselves, but in petitioning congress to reduce it within the desired limits. Judges are not put in their places to declare what the law ought to be. That function is legislative and political. The duty

of judges is the narrow one of determining what the law is, and, on the stern principle, *ita lex scripta*, of enforcing it as it is given to them by the legislature, and interpreted to them by such courts as may be superior to them in authority; and they would present a miserable spectacle of unworthiness if they should be swerved from the line of that duty by any clamor, however vehement, however censorious. Even if the judge of a court pronounces the law to be as he thinks, and a court or judge of higher jurisdiction construes it differently, then he must abandon his own view, and enforce the law as thus interpreted to him. To this he is sworn; and the responsibility of an improper ruling is not his. There could be no certainty or uniformity in the law, if each judge could set his individual opinion against that which controls the system of jurisprudence of which he is a part.

From what has been said, it is plain, that even if this were a suit by the complainant corporation, which is a citizen of Virginia, against the state herself in her own sovereign character, the jurisdiction of this court to entertain it exists under an act of congress passed in pursuance of a provision of the national constitution; that is to say, by grant from the state of Virginia herself. If there be fault in the grant, the imputation belongs not to the judges who administer the law as given them, but to the great and wise men who brought our Commonwealth into the Union, under a constitution framed in the inspiration of a devoted, though possibly, in some particulars, an erring, patriotism.

2. The second ground of defense in this suit is "that the bill shows on its face that before the tender of the coupons named therein they were not ascertained to be genuine and tax-receivable as required by the provisions of the act of the general assembly of Virginia, approved January 14, 1882; and hence the auditor had no power or right to receive said coupons for any taxes." The defense on this head is put solely upon the ground of non-compliance by the complainant with the provisions of the act of January 14, 1882. No subsequent act of assembly forbidding the payment of taxes in other than gold, silver, or other money of the United States, is adduced in excuse for the auditor's refusal to receive the coupons tendered. The averments of the bill, as to this refusal, are as follows, and, under the pleadings in the case, are admitted to be true:

"Your orator shows that the said auditor is the officer appointed by law to receive the said tax, and to receive coupons tendered in payment thereof, and that it hath been the custom of his predecessors anterior to 1883 to receive the same, and that it is his duty to receive these tax-receivable coupons. But complainant shows that the said auditor refused to receive the said coupons in payment of your orator's tax, thus depriving it of its rights secured under the constitution and laws of the United States," etc.

There is no plea interposed on the part of the auditor to this charge of the bill, setting out that he himself complied with the pro-

visions of the act of January 14, 1882, and after doing so, refused to give complainant a receipt for the tax, as authorized by the statute. His sole ground of defense on this head is that the coupons tendered had not been ascertained to be genuine under the act of January 14, 1882. What are the provisions of that act? It requires the positive performance of specific duties by the revenue officer as well as the tax-payer. It provides that whenever any tax-payer or his agent shall tender to the proper officer of the state coupons detached from bonds of the commonwealth issued under the act of 1871, in payment of taxes, as was done in this case, the person to whom such coupons are tendered shall do certain things enumerated with precision by the act, viz, (1) he shall receive the same, giving the party tendering a receipt, stating that he has received them for the purpose of identification and verification; (2) he shall at the same time require such tax-payer to pay his taxes in coin, etc., and upon payment give him a receipt for the same; and (3) he shall mark each coupon so received with the initials of the tax-payer from whom received, and the date of receipt, and shall deliver the same securely sealed up to the judge of the county or corporation court of the county or corporation in which such taxes are payable. It is not set up by plea, or pretended in any form of defense, that the auditor, whom the act of January 14, 1882, expressly and imperatively requires to do these three things when coupons are tendered to him in the voluntary payment of taxes, did either of them. Under the authority of later laws, not pleaded, forbidding absolutely the receipt of anything but coin or currency notes for taxes,—instead of receiving the coupons in good faith for the purpose of verification, as the act required,—he rejected them absolutely. He now invokes, in defense of his refusal, a law which expressly requires him to receive them, and whose provisions, enacted for just such a case as this, he himself has disregarded. For this is a case of a tax-payer going voluntarily to the receiver of taxes and tendering payment of the tax. It is of the class which is contemplated by the act of January 14, 1882, known as "Coupon Killer No. 1," and is not a case in which the collector of the tax takes the initiative, as contemplated by the act of January 26, 1882, known as "Coupon Killer No. 2." Therefore, the provisions of sections 1, 2, and 3 of the former act rule in this case; and no provision of the later act affects it. Moreover, the later act, with its amendments, has been nullified by the recent decisions of the supreme court of the United States; while that court has affirmed the validity of the former act, especially sections 1, 2, and 3, with iteration in *Antoni* v. *Greenhow,*107 U. S. 769; S. C. 2 Sup. Ct. Rep. 91; and in *Moore* v. *Greenhow,* 114 U. S. 338; S. C. 5 Sup. Ct. Rep. 1020.

I think it clear from the decisions of the supreme court, on the legislation of the state as it now stands, that when a tax-payer tenders coupons, they must either be received as genuine, or be received for verification in the manner provided by the act of January 14,

1882. If the officer refuses the coupons outright, he puts it out of the tax-payer's power to become a party to their judicial verification; and the state, by the act of the officer, waives her right to the verification; and this because the tax-payer has no power to verify his coupons until after he tenders them, and after the state, having received them, herself has initiated the judicial proceeding by which alone they can be verified. When, therefore, in a suit resulting from such a refusal and such a waiver, the complainant alleges in his bill that the coupons were genuine, cut from genuine bonds, identifying them by dates and numbers; and the state demurs and answers, or pleads simply that the coupons had not been verified at the time of tender, she waives and abandons her right to verification, and brings herself within the decisions of the supreme court in the late cases of *Poindexter* v. *Greenhow*, *White* v. *Greenhow*, *Chaffin* v. *Taylor*, and *Allen* v. *Baltimore & O. R. Co.*, 114 U. S. 269–340; S. C. 5 Sup. Ct. Rep. 903–962. In those cases the record showed that the state had not taken advantage of her rights under the act of January 14, 1882, and had not denied the genuineness of the coupons in her pleadings. In some of the cases the record showed that she admitted the genuineness. She was in court in that plight. It was in this class of cases that the supreme court (while expressly excepting cases of the class of *Antoni* v. *Greenhow*) held, that "it is the legal duty of every tax-collector to receive tax-receivable coupons in payment of taxes upon an equal footing and with equal effect as though they were money;" and that "after a tender of such coupons duly made for that purpose, the situation and rights of the tax-payer and coupon-holder are precisely what they would have been if he had made a like tender in money." The case at bar is therefore governed by the reasoning and decision in *Poindexter* v. *Greenhow*, 114 U. S. 270; S. C. 5 Sup. Ct. Rep. 903, and the second ground of defense set up in the demurrer and answer is invalid.

3. Coming to the third ground of defense, it is, that the bill prays for an injunction to forbid defendant from refusing to receive the coupons that were tendered, which is virtually a command to receive them (such a writ being known as a mandatory injunction;) that this was one of the prayers of the bill in the *Parsons Case*; and that, therefore, the ruling of the supreme court in the case of *Marye* v. *Parsons*, decided in April last, disposes of this suit. That case was got up by counsel for the complainant and the state, at my request, in February last, in order to submit to the supreme court, which had recently advanced the Virginia coupon cases for hearing on the eighteenth of March, the principal questions that have arisen in the controversy of Virginia with the holders of her bonds and coupons. The cases which were then already before the court were not thought to present the most important questions belonging to the controversy; and the result has shown that the rulings of the supreme court in them have left these questions very much where they were before.

It was in the hope of avoiding this unsatisfactory result that the *Parsons Case*, which embodied all the important questions incident to the subject, was got up by mutual consent of counsel, and sent by me to the supreme court for hearing in March last. This hope has been disappointed. The court did not consider the case on any of the questions referred to. The majority of the court decided it upon a point not raised by the petition for appeal, and not urged or thought of by any counsel in argument before this court, or, as I learn, before that tribunal itself. Neither the question of the validity of the mandatory injunction was considered, nor the question under what circumstances coupons should be verified, nor the question whether the genuineness of coupons averred by the plaintiff must be denied by the state in the pleadings, and the denial be sworn to by a proper officer for her; nor the question whether or not a mere plea by the state that the coupons were "unverified" was sufficient, nor any other question going to the merits of the controversy and raised in that suit. None of these questions were considered by the court or passed upon.

The majority of the court, four justices dissenting from the reasons assigned for the decision, dismissed the cause on the preliminary ground that Parsons, who was not a tax-payer and had not actually sold his coupons, could not sue at all. They pronounced his right to sell his coupons for the purpose of having them used in the payment of taxes a mere right *in thesi*, of which he himself could not avail in a court of justice. Dismissing the suit on this preliminary ground, they left all questions involved in the case unconsidered and undecided. They did not consider or pass upon the validity of the mandatory injunction which the supreme court had over and over again affirmed in previous cases; and, therefore, it is no ground of defense in the case at bar that the *Parsons Case* was dismissed by the supreme court.

The mandatory injunction is as old as the high court of chancery of England, and will be used as long as the English-speaking race shall maintain a system of chancery judicature. It belongs to the inherent prerogatives of the chancery courts; and to abolish it would be to paralyze their entire jurisdiction. Nothing could have been further from the intention of the supreme court than to impair this writ in any degree.

The defendant's third ground of defense is therefore invalid, and I think that, on the whole case, the prayers of the complainant's bill must be granted, and I have signed a decree to that effect, drawn in conformity with decrees heretofore granted in similar cases by the circuit judge.

NOTE BY JUDGE HUGHES.—While, as in duty bound, I would enforce with alacrity and zeal as a judge the decision of the supreme court in a case governed by it, yet I know I shall be excused for venturing to express, as a citizen and lawyer, the confident belief that the supreme court will sooner or later recede from its ruling on the point on

which, without argument or a hearing, it dismissed the case of Marye v. Parsons. If it should not do so, the rights of the holders of Virginia bonds, in respect to the receivability of coupons in payment of taxes, will be short-lived. The state's contract that these shall be tax-receivable is with the bondholder, and is not with the tax-payer before he purchases coupons. It subsists as long as the bondholder holds, and ceases with him when he sells his coupons. The unqualified doctrine, that his right while holding is a mere right *in thesi* which the courts are not bound to protect, can be used by the state to utterly defeat his right to sell. The state has no contract with the tax-payer before his purchase of coupons. Legislation forbidding such tax-payer from purchasing coupons for the purpose of paying taxes would violate no contract with him. It would violate only the state's contract with the coupon-holder, whose right is now pronounced to be one *in thesi*, which the courts are informed by the decision in the Parsons Case that they are powerless to protect, and which, of course, if the courts are prohibited from protecting, the legislature is not bound to regard.

Legislation to this effect, while inflicting no wrong at all upon the tax-payer who has not purchased coupons, would inflict it only upon the holder of coupons who is not a tax-payer; and as to whom the wrong is now pronounced to be *damnum absque injuria*. This phrase *damnum absque injuria*, (wrong for which the doer cannot be called *in jus*,) wrong which is not actionable at law, is a maxim more of the courts of law than those of chancery. The very fact that no remedy for a wrong is afforded at law is one of the principal grounds of equitable jurisdiction; and I know of no case, until that of Marye v. Parsons, in which the maxim had ever been unqualifiedly applied in denial of an injunction. No principle had been more firmly established than that injunction will lie to restrain the violation of a right actually threatened, even though there be no ground of present action. Injunction is not limited to cases where an action at law can be maintained, but extends to cases where, in consequence of the infirmity of legal process, there is neither a right nor a remedy at law, but only what is an essential wrong, threatened and imminent. The rule in such cases is simple; it is elementary. When a right is violated, redress is to be had by an action at law. When it is threatened, actually threatened, it may be protected by injunction in equity. When it is neither violated nor threatened it is a right *in thesi*, respecting which the courts will not interfere.

It is very true that the mere existence of a contract right, and mere prospect or apprehension of a violation of it, will not authorize a court to interfere for its protection. But if an intention to infringe the right or a threat to violate it is shown, then equity will interfere by injunction to protect it. The cases which support this proposition, as well English as American, are absolutely too numerous for citation. In the Parsons Case this intention of the state to refuse the reception of complainant's coupons in payment of taxes, especially license taxes, was apparent, avowed, and of statutory record. The tax-receiver had been fenced in from the coupons by a series of legislative acts and of instructions to revenue officers as impervious and bristling with barbs as a modern wire fence. These were fully described in the bill; and the case was one not merely of a right *in thesi*, but of a right denied, threatened, and effectually defeated by ingenious devices avowedly contrived for the purpose.

The courts have gone very far in the protection of rights threatened in advance of actual violation. In Prince Albert v. Strange, 1 Macn. & G. 25, Lord Cottenham repudiated the notion that an injunction would not be granted unless an action would lie, holding that the injunction in chancery does not depend upon any legal right, meaning a right actionable at law. In the case cited, Prince Albert owned, and had in his private galleries, not for sale, certain etchings or drawings,—which were the only genuine ones extant,—and Strange was advertising for sale copies and catalogues of them. The bill was to enjoin the proceedings of Strange. It did not aver that Prince Albert's property rights were affected. The court, acknowledging that the wrong to the prince was *damnum absque injuria*, granted the injunction, and afterwards made it perpetual; holding it to be a part of the original and independent jurisdiction of chancery not merely to grant protection to a legal right, but to prevent what the court considers and treats as a wrong.

So, in the case of the Emperor of Austria v. Day, 3 De Gex, F. & J. 217, the Hungarian patriot, Kossuth, was causing notes of circulation to be printed in London, to be issued as money in Hungary upon the inauguration of an intended revolution there Nothing could be more intangible and imaginary than the personal injury which the occupant of the imperial throne of Austria was sustaining, in his character of king of Hungary, from the printing of those kiting debentures of a wandering exile. To use the language of the supreme court of the United States in the Parsons decision, it was "a clear case of *damnum absque injuria*." Yet the English high court of chancery granted an injunction restraining the printing of this inchoate Hungarian money, the ground of the injunction being that the issuing of these notes would affect the value of the notes of the imperial Bank of Hungary, then in circulation in that country, to the injury of the revenues of the imperial plaintiff.

Protective injunctions from the United States circuit courts have been habitually sanctioned by the supreme court. In the case, for instance, of Board of Liquidation v. McComb, 92 U. S. 531, an injunction of the circuit court to restrain a course of funding which was only indirectly and contingently prejudicial to the complainant bondholder, and whose injury from which could not be compensated in damages by an action of tort, was sanctioned by the supreme court. I am persuaded, therefore, that when the supreme court comes to act, after a hearing and full argument on a case in which the holder of coupons, with whom the state of Virginia has contracted that they shall be received in payment of taxes, applies to a court of chancery for protection of his rights against the obstruction of officers vouching unconstitutional legislation in excuse, it will not close the doors of justice against him.

See Hans v. State of Louisiana, 24 Fed. Rep. 55.—[ED.