## MARYE, Auditor, and Others, *v*. PARSONS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE EASTERN DISTRICT OF VIRGINIA.

The contract right of a coupon-holder under the Virginia act of March 30, 1871, whereby his coupons are receivable in payment of taxes, can be exercised only by a tax-payer; and a bill in equity, for an injunction to restrain tax collectors from refusing to receive them, when tendered in payment of taxes, will not lie in behalf of a coupon-holder who does not allege himself to be also a tax-payer. Such a bill calls for a decree declaring merely an abstract right, and does not show any breach of the contract, or other ground of relief.

*Mr. F. S. Blair*, Attorney-General of the State of Virginia, and *Mr. Walter B. Staples* for appellants.

*Mr. Richard L. Maury* and *Mr. Wager Swayne* for appellee. [*Mr. Daniel H. Chamberlain* filed a brief for the same.]

Mr. Justice Matthews delivered the opinion of the court.

The appellee, who was complainant below, a citizen of New York, filed his bill in equity, in the Circuit Court of the United States for the Eastern District of Virginia, against Morton Marye, described as Auditor of the Commonwealth of Virginia; Samuel C. Greenhow, Treasurer of the City of Richmond; A. L. Hill, Treasurer of the City of Norfolk, and V. G. Dunnington, Treasurer of the City of Lynchburg; R. B. Munford, Commissioner of Revenue for the City of Richmond, Charles W. Price, for the City of Lynchburg, and Charles D. Langley, for the City of Norfolk, all citizens of Virginia.

The complainant avers in his bill that he is the owner of overdue coupons to the amount of $28,010, cut from bonds of the State of Virginia issued under the act of March 30, 1871, which coupons are receivable, by the terms of that act, in payment, at and after maturity, for all taxes, debts and demands due the State. A list of these coupons, described by the numbers and amounts of the bonds, is exhibited with the

bill. He claims that these coupons constitute a contract with the State, by which it agreed to pay the amount of each to the holder at maturity, and, second, in case of default, that the holder should have the right to assign or transfer the same to any tax-payer or other debtor of the State, with the quality of being received for taxes and other demands due the State, and with the guarantee that the State would receive them specifically in payment *pro tanto* for any such taxes and demands, and that they should be accepted by any of her tax collectors from any of her tax-payers or debtors, in discharge and payment of such taxes or dues.

The defendants to the bill, it is alleged, are officers of the State, charged severally with the collection of certain taxes and license fees and other dues to the State; and it is charged that, in pursuance of certain statutes passed since the act of March 30, 1871, and the issue of the bonds and coupons under it, they are forbidden to receive these and similar coupons in payment of taxes and other dues to the States, which statutes, it is averred, impair the obligation of the contract between the State and the holder of its coupons, and are accordingly in violation of the Constitution of the United States, and are null and void; but that, nevertheless, the defendants, as officers of the State, as is publicly known, habitually refuse to accept coupons when tendered by tax-payers, in payment of taxes and other dues to the State, with the collection of which they are severally charged, and the General Assembly of Virginia has also passed statutes repealing all laws which provided any remedy for the enforcement of the right to have them so received.

The bill then proceeds as follows:

"And your petitioner furthermore shows that, confiding in his right to a specific performance of said contract, and in his title to equitable relief, should the same be denied, he hath made arrangements with sundry tax-payers of Virginia to use his above coupons in payment of their taxes and license taxes, now due, by which arrangement, if the said coupons can be used without delay or difficulty, he will receive nearly par therefor, and thus be able to have his coupons collected.

But, unless they are so accepted in payment when tendered, the said tax-payers will not use them at all, because they are compelled to pay their taxes forthwith under heavy penalties, and to obtain their licenses immediately, or cease from business, so that, if the collectors of these taxes continue to refuse to accept these coupons, and so render necessary an appeal to the courts, and a separate action by each tax-payer upon each tender, such refusal will be tantamount to an utter destruction of the rights of your petitioner, because delays will thus occur which the tax-payers cannot submit to for the above-named reasons and others, and thus your petitioner will be deprived of the benefit of the arrangements he has made, as well as of all opportunity of having his coupons so used at any time save in small amounts and at rare intervals."

The prayer for relief is as follows:

"In tender consideration whereof, and inasmuch as your petitioner is without adequate relief save in a court of equity, wherein such matters are properly cognizable, and inasmuch as he will suffer great and irreparable loss and damage, exceeding $500 in amount, unless relief is afforded him immediately, and the above-named officers are required to perform specifically the contract aforesaid, and receive his said coupons in payment of all or any of the dues and taxes above-named immediately upon their being tendered therefor by any tax-payer or applicant for a license, and to avoid a multiplicity of suits and prevent an obstruction of justice, he prays that Morton Marye, Auditor of Virginia, Samuel C. Greenhow, A. L. Hill, and V. G. Dunnington, Treasurers of the Cities of Richmond, Norfolk, and Lynchburg, respectively, and R. B. Munford, Charles D. Langley and Charles W. Price, Commissioners of the Revenue for said cities, respectively, be made parties defendant hereto, with apt words to charge them, and may be required on oath to answer fully the allegations hereof.

"And that the said defendants, their assistants, clerks, and agents, be required and compelled to specifically perform the said coupon contract according to its legal tenor and effect, and to accept your orator's said coupons, or any of them, from any tax-payer presenting them or any of them in payment of

his taxes, license taxes, or other dues, and to receipt therefor, or certify the payment and deposit thereof, in cases of applications for license, in precisely the same form and with precisely the same force and effect as they would do if said tender, payment, or deposit were made in money. And that your honors will decree said coupons to be genuine, legal coupons, legally receivable for all taxes, debts, and demands due the State of Virginia, and especially for all license taxes or assessments by whatever name the same may be called. And to the end that your orator may have full relief in the premises he also prays that a preliminary restraining order and injunction may be issued without delay, enjoining and restraining the said defendants, their assistants, clerks, and agents, and each and every one of them, from refusing to accept any of the coupons named in the Exhibit A herewith, in full payment *pro tanto* of the taxes, license taxes, or other dues, due by any tax-payer to the State who may tender the same in payment thereof, and enjoining and restraining them from refusing to execute and deliver forthwith to such tax-payer his tax-bill, duly receipted, or to an applicant for a license a certificate that the amount of coupons tendered by such applicant has been deposited with him in payment of the tax or deposit required or assessed for said license, and from refusing, immediately upon the presentation of such certificate, to grant and issue the license applied for to such applicant, all in the same manner, and to have precisely the same force and effect as if said payments were made in coin or currency."

There is also a prayer for general relief.

There was a final decree on bill, answer, replication and proofs, granting the injunction as prayed for, and the defendants appealed.

This bill is without precedent, and should have been dismissed. It is a clear case, as stated, of *damnum absque injuriâ*. So far as the contract with the complainant was, that the State should pay to him his coupons at maturity, there is, no doubt, a breach; but he asks no relief as to that, for there is no remedy by suit to compel the State to pay its debts. So far as the contract was to receive the coupons of the complainant

in payment of taxes and other dues to the State, there is no breach, for he does not allege that any of them have been tendered by any tax-payer or debtor to the State in payment of taxes or other dues; nor that there has been a refusal on the part of any tax collector, or other officer of the State charged with the collection and receipt of taxes and dues to the State, to receive them in payment therefor. Personally the complainant has no right to offer them for such purpose, for he owes no taxes or other debt to the State. There is nothi 'shc wn in the bill by which he is prevented from transferring them to others who would have the legal right to use them in that way, except that, being discredited for such uses by the previous refusals of the officers of the State to receive, other, but similar, coupons, the complainant can find no one willing to purchase them from him at a reasonable price for such purposes. This damage is not actionable, because it is not a direct and legal consequence of a breach of the contract, and is not distinguishable from the damage any creditor might suffer from the known inability or unwillingness of his debtors to perform their obligations. Such discredit might, and often does, result in the bankruptcy and financial ruin of the creditor, but no action lies to recover damages for the consequential loss, which the law does not connect with the default, as cause and effect. To enable the complainant to avail himself of the benefit of his contract with the State, to receive his coupons in payment of taxes, he must first assign them to some one who has taxes to pay, as he has not; but when he does so, by the assignment, he has lost his interest in the contract and his right to demand its performance, all right to which he has transferred with the coupons. It is only when in the hands of tax-payers or other debtors that the coupons are receivable in payment of taxes and debts due to the State.

The bill as framed, therefore, calls for a declaration of an abstract character, that the contract set out requiring coupons to be received in payment of taxes and debts due to the State is valid; that the statutes of the General Assembly of Virginia impairing its obligations are contrary the Constitution of the United States, and therefore void; and that it is the legal

duty of the collecting officers of the State to receive them when offered in payment of such taxes and debts.

But no court sits to determine questions of law *in thesi.* There must be a litigation upon actual transactions between real parties, growing out of a controversy affecting legal or equitable rights as to person or property. All questions of law arising in such cases are judicially determinable. The present is not a case of that description.

*The decree of the Circuit Court is accordingly reversed, and the cause is remanded, with directions to dismiss the bill.*

MR. JUSTICE BRADLEY, with whom concurred the CHIEF JUSTICE, MR. JUSTICE MILLER and MR. JUSTICE GRAY, dissenting.

The Chief Justice and Justices Miller, Gray and myself dissent from the opinions and judgments of the majority of the court in which they sustain the claims of the holders of coupons against the State of Virginia, and I have been requested to state the grounds on which our dissent is based. And, first, those which apply to the case of the Baltimore and Ohio Railroad Company. This company is a corporation of the State of Maryland, and operates, as lessee, certain railroads situated in Virginia. It filed a bill in equity in the Circuit Court of the United States for the Western District of Virginia, alleging a tender of coupons in payment of the taxes due upon the railroads in its possession, and praying for a decree declaring that such tender (with a deposit of the coupons in court) amounted to payment, and that the proceedings of the auditor in imposing a penal assessment for pretended non-payment of the taxes were void, and that an injunction be issued to restrain the treasurer from seizing or selling any of the property of the company for the said taxes.

The fundamental ground of our dissent is, that this proceeding, and all the other proceedings on these coupons brought here for our review, are virtually suits against the State of Virginia, to compel a specific performance by the State of her agreement to receive the said coupons in payment of all taxes, dues and demands. However just such a proceeding may seem in the abstract, or however willing courts might be to sustain

it if it were constitutional, yet, looking at the case as it really is, we regard it as directly repugnant to the Eleventh Amendment of the Constitution, which declares that "the judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against any one of the United States, by citizens of another State, or by citizens or subjects of any foreign State."

. The counsel for the bondholders press upon our attention that provision of the Constitution which declares that no State shall pass any law impairing the obligation of a contract, and insists that the laws passed by the Legislature of Virginia forbidding the receipt of coupons for taxes, since the passage of the act of 1871 by which they were made receivable, are unconstitutional and absolutely void, and that no officer or tax collector of the State is bound to regard, but, on the contrary, each is bound to disregard them. So that we have one provision of the Constitution set up against the other, and are asked to enforce that relating to contracts by regarding the individual officers as the real parties proceeded against, and ignoring the fact that, in the matter of receiving coupons in payment of taxes, the officers only represent the State. By this technical device it is supposed that the Eleventh Amendment may be evaded. In our opinion this is not a sound or fair interpretation of the Constitution. If the contract clause and the Eleventh Amendment come into conflict, the latter has paramount force. It was adopted as an amendment to the Constitution, and operates as an amendment of every part of the Constitution to which it is at any time found to be repugnant. Every amendment of a law or constitution revokes, alters or adds something. It is the last declared will of the law-maker, and has paramount force and effect. The States became dissatisfied with certain parts of the Constitution as construed by the courts, whereby, in a manner not anticipated, they were subjected to be dragged into court like a common delinquent at the suit of individuals. They demanded that this should be changed, and it was changed by the Eleventh Amendment. The language of the Constitution was not changed, but it became subject and subordinate to the paramount declaration of

the amendment.   The Constitution still declares that no State shall pass any law impairing the obligation of a contract; but the effect of the amendment is that, even if a State should pass a law impairing the validity of its own contract, no redress can be had for the enforcement thereof against the State in the federal courts.   In other words, in consequence of the amendment, no State can be coerced into a fulfilment of its contracts or other obligations to individuals by the instrumentality of the Federal Judiciary.   It is true, it cannot proceed against them contrary to its contract; but, on the other hand, it cannot be proceeded against on its contract.   All those who deal with a State have full notice of this fundamental condition.   They know, or are bound to know, that they must depend upon the faith of the State for the performance of its contracts, just as if no Federal Constitution existed, and cannot resort to compulsion unless the State chooses to permit itself to be sued.

Moreover, the Eleventh Amendment is not intended as a mere formula of words, to be slurred over by subtle methods of interpretation, so as to give it a literal compliance, without regarding its substantial meaning and purpose.   It is a grave and solemn condition, exacted by sovereign States, for the purpose of preserving and vindicating their sovereign right to deal with their creditors and others propounding claims against them, according to their own views of what may be required by public faith and the necessities of the body politic. We have no right, if we were disposed, to fritter away the substance of this solemn stipulation by any neat and skilful manipulation of its words.   We are bound to give it its full and substantial meaning and effect.   It is only thus that all public instruments should be construed.

Now, what is the object of all this litigation which fills our courts in reference to the Virginia bonds and coupons, but an attempt, through the medium of the federal courts, to coerce the State of Virginia into a fulfilment of her contract?   To enforce a specific performance of her agreement?   It is nothing less.   That is the object of the bill in the case of the Baltimore and Ohio Railroad Company.   That is the object

of the bill of Parsons against the State Auditor and others. That is also the object of those actions of detinue and trespass which are brought against the collectors of Richmond and other places. Injunctions are sought, mandamuses are sought, damages are sought, for the sole purpose of enforcing a specific performance of the engagement made by the State by the act of 1871, to receive the coupons of its bonds issued under that act in payment of taxes and other dues to the State.

There is no question about the validity of the taxes. They are admittedly due. The officer is entitled to collect them; his authority is undisputed. The coupons are tendered in payment—not as money, for they have no quality of money—but as a set-off, which, as is insisted, the State has agreed to allow. The tax-payer stands on this agreement. That is the situation; and that is the whole of it. He stands on the agreement and seeks to enforce it. All suits undertaken for this end are, in truth and reality, suits against the State, to compel a compliance with its agreement.

A set-off is nothing but a cross-action, and can no more be enforced against a State without its consent than a direct action can be. When set-offs are allowed against the sovereign, it is always by virtue of some express statute.

It is argued, however, that these coupons are not set-offs, but cash. How it can be pretended that they are cash it is difficult to comprehend. To regard them as cash would make them unconstitutional and void under that clause of the Constitution, which prohibits any State from emitting bills of credit. But it is insisted that, if not cash, the State agreed that they should be received as cash. Then, it is the agreement which is relied on; and, as before said, it is the performance of this agreement which is sought to be enforced.

Another argument made use of to show that the coupons are not set-offs, is, that by virtue of the agreement to receive them in payment, they inhere in the claim for taxes as a ground of extinguishment, and not as a distinct counter-demand. This cannot be true, because taxes imposed by the State, or by its authority, are pure and unmixed duties, accruing year by year for the public service, without any relation to, or dependence

upon, collateral obligations. Whether the tax-payer has or has not any coupons is an accidental circumstance in no way affecting his taxes. If he has them, and does not tender them, his taxes must be paid; if he has them, and does tender them, they can only be tendered by way of set-off; for, as we have seen, they have no necessary connection with or relation to the taxes until they are so tendered.

The coupons, then, are tendered, and the tax collector declines to receive them. The State does not permit him to receive them. By subsequent legislation it has declared that the taxes must be paid in money, and that the tax collector must receive nothing else in payment, and that coupons, if offered, must be investigated in a juridical way to ascertain their genuineness before they will be paid, and when so ascertained, the provision for paying them is ample. The officers have no power but what the State gives them. They act for and on behalf of the State, and in no other way. To sue them, therefore, because they will not receive the coupons in payment, is virtually to sue the State. The whole object is to coerce the State. To say otherwise is to talk only for effect, without regard to the truth of things.

If the taxes were not due, or were unconstitutional, and the collector should attempt to collect them, by seizing property or otherwise, it would be a different thing. There would then be an invasion of the citizen's property without lawful authority. That would be a trespass on the part of the officer for which he would be properly liable in suit. So, if the tax-payer should tender the amount of his tax in lawful money and the collector should refuse it, and should proceed to distrain for the tax, then he would also be a trespasser.

But neither of these things is the case. The tax is due—undisputedly due; no money is tendered; the tax-payer only offers to set off the coupons, which are nothing but due bills of the State, and pleads the State's collateral agreement to receive them. This is not money, and bears no resemblance to money. It is simply a promise. The State, for reasons of its own, declines to comply with its agreement in mode and form, and forbids its officers to receive the coupons in payment of

taxes. The tax-payer insists that the State shall comply with its agreement. All the proceedings instituted by him to enforce the receipt of the coupons, or to obtain redress against the collector for not receiving them, or for proceeding to collect the tax, have that object alone in view—to compel the State to fulfil its agreement. It is idle to say that the proceeding is only against the officers. That is a mere pretence. The real object is to coerce the State through its officers; to compel a specific performance by the State of its agreement. It all comes back to this.

But it is said that it is not the State, but the government of the State, which declines to receive the coupons, contrary to engagement. It is said that the government does not represent the State when it does an unconstitutional act, or passes an unconstitutional law. Whilst this may be averred, as it was averred in *Texas* v. *White*, 7 Wall. 700, when the government of a State attempts to force the State from its constitutional relations with the United States, and to produce a disruption of the fundamental bonds of the national compact; and whilst in such a case it may be admissible to say, that the government of the State has exercised a usurped authority, this mode of speech is not admissible in ordinary cases of legislation and public administration. A State can only act by and through its constituted authorities, and it is represented by them in all the ordinary exhibitions of sovereign power. It may act wrongly; it may act unconstitutionally; but to say that it is not the State that acts is to make a misuse of terms, and tends to confound all just distinctions. It also tends, in our judgment, to inculcate the dangerous doctrine that the government may be treated and resisted as a usurpation whenever the citizen, in the exercise of his private judgment, deems its acts to be unconstitutional.

But, then, it will be asked, has the citizen no redress against the unconstitutional acts or laws of the State? Certainly he has. There is no difficulty on the subject. Whenever his life, liberty, or property is threatened, assailed or invaded by unconstitutional acts, or by an attempt to execute unconstitutional laws, he may defend himself, in every proper way, by

*habeas corpus,* by defence to prosecutions, by actions brought· on his own behalf, by injunction, by mandamus. Any one of these modes of redress, suitable to his case, is open to him. A citizen cannot, in any way, be harassed, injured or destroyed by unconstitutional laws without having some legal means of resistance or redress. But this is where the State or its officers moves against *him.* The right to all these means of protection and redress against unconstitutional oppression and exaction is a very different thing from the right to coerce the State into a fulfilment of its contracts. The one is an indefeasible right, a right which cannot be taken away; the other is never a right, but may or may not be conceded by the State; and, if conceded, may be conceded on such terms as the State chooses to impose.

All the cases that are cited from the books in which redress has been afforded to individuals by the courts against State action are cases arising out of the first class, and not out of the second; cases of State aggression, and not of refusal to fulfil obligations. The case of *Osborn* v. *The United States Bank,* 9 Wheat. 737, was of that class; so was that of *Dartmouth College* v. *Woodward,* 4 Wheat. 518; so was that of *New Jersey* v. *Wilson,* 7 Cranch. 164. So, if looked at carefully, were those of *Davis* v. *Gray,* 16 Wall. 203, and the *Board of Liquidation* v. *McComb,* 92 U. S. 531; although these last cases approach nearer to suits against a State than any others which have received the sanction of this court. In all these cases the State has attempted to do some unconstitutional act injurious to the party, or some act which it had entered into a contract not to do; and redress was sought against such aggressive act.; they, none of them, exhibit the case of a State declining to pay a debt or to perform an obligation, and the party seeking to enforce its performance by judicial process.

As for the great mass of cases in which the remedies of mandamus and injunction have been sanctioned, to compel State officers to do, or refrain from doing, some act in which the plaintiff had an interest, they have generally been cases in which the law made it the duty of the officers to do the act commanded, or not to do the act forbidden. Those of a different

character, as where a remedy has been taken away, have been purely cases of demands by one individual against another, and not of an individual against the State.

The present cases differ *toto cœlo* from any of these. They are attempts to coerce a State by judicial proceedings; as before stated, they are that, and nothing else. It is useless to attempt to deceive ourselves by an adroit use of words, or by a train of metaphysical reasoning. We cannot, in that way, change the nature of things.

This is the first time, we believe, since the Eleventh Amendment was adopted, in which a State has been coerced by judicial proceedings at the suit of individuals in the federal courts. That this is such a case, seems one of the plainest propositions that can be stated.

As the observations already made apply equally to actions against the officers of the State brought to recover damages, or to recover property taken for taxes, as to bills for injunction and applications for mandamus, only a few words are necessary to be added in reference to the suit of *Poindexter* v. *Greenhow*, in which the first opinion was read, and to the trespass cases similarly situated. Those are actions brought not by citizens of another State, but by citizens of Virginia herself, in her own courts; and the highest court of Virginia has adjudged them to be untenable. Our jurisdiction is invoked to reverse this decision, and to sustain the actions.

The Eleventh Amendment, it is true, does not prohibit the extension of the judicial power of the United States to suits prosecuted against a State by its own citizens. But the evident reason of this is, that the judicial power was not granted to the United States by the original Constitution in such cases: hence, as it was not granted, it was not deemed necessary to prohibit it. It was evidently supposed that the control of all litigation against a State by its own citizens was in its own power, amongst that mass of rights which was reserved to the States and the people. It would be very strange to say that, although a State cannot, in any case, be sued by a citizen of another State since the adoption of the Eleventh Amendment, yet, in a case arising under the Constitution and laws of the

United States, it may be sued by its own citizens. This would be to deprive the State, with regard to its own citizens, of its sovereign right of exemption from suit.

It seems to us that the absurdity of this proposition is its sufficient answer. Unless the State chooses to allow itself to be sued, it cannot be sued; it has this prerogative if no other. It is admitted, in point of form, that it cannot be sued by the citizens of other States, or of foreign States, because of the Eleventh Amendment. The whole argument of the opinions of the majority of the court is directed to the object of showing that the State is not sued in the suits under consideration. We do not remember that it is anywhere contended that the State can be sued by its own citizens, against its own law, merely because the Eleventh Amendment does not in terms extend to that case.

In our judgment none of these suits can be maintained, for the reason that they are in substance and effect suits against the State of Virginia.

We have not thought it necessary or proper to make any re-marks on the moral aspects of the case. If Virginia or any other State has the prerogative of exemption from judicial pros-ecution, and of determining her own public policy with regard to the mode of redeeming her obligations, it is not for this court, when considering the question of her constitutional rights, to pass any judgment upon the propriety of her conduct on the one side or on the other.