## KEEGAN *v.* UNITED STATES.

**NO. 39.**

Argued November 9, 10, 1944.—Decided June 11, 1945.

*Messrs. John F. X. Finn* and *Harold W. Hastings* and *Mr. William H. Timbers, pro hac vice,* with whom *Messrs.*

*Leo C. Fennelly, George S. Leisure, Joab H. Banton* and
*George ·C. Norton* were on the brief, for petitioners in
No. 44. *Carl Frederick Berg, Ernest Martin Christoph,
John C. Fitting, William C. Kunz, William Ottersbach,
Max Rapp* and *Louis Schatz*, petitioners in No. 44, sub-
mitted *pro se. Wilbur V. Keegan,* petitioner in No. 39,
submitted *pro se.*

*Mr. James M. McInerney,* with whom *Solicitor General
Fahy, Assistant Attorney General Tom C. Clark, Messrs.
Robert S. Erdahl, Ralph F. Fuchs, William Strong, Irving
S. Shapiro* and *Peter J. Donoghue* were on the brief, for
the United States.

*Mr. John F. X. Finn* filed a brief, as *amicus curiae,*
urging reversal.

MR. JUSTICE ROBERTS announced the judgment of the
Court and delivered the following opinion, in which MR.
JUSTICE FRANKFURTER and MR. JUSTICE MURPHY concur.

Two indictments, one returned July 7, 1942, the other
returned August 26, 1942, charged a conspiracy beginning
January 1, 1940, and ending at the dates the indictments
were found. The evident purpose of the second was to in-
clude several additional defendants as alleged conspirators.
We shall treat them as one.

The conspiracy charged was to counsel divers persons
to *evade, resist,* and *refuse service* in the land and naval
forces of the United States in violation of § 11 of the Selec-
tive Training and Service Act of 1940, 50 U. S. C. App. 311.

The Act defines the crime as conspiracy *"knowingly"* to
counsel "another to *evade registration or service* in the
land or naval forces . . ."

The proofs would not sustain, and the indictment does
not contain, any charge of conspiracy to counsel evasion
of registration.

In certain paragraphs of the indictment it is charged

(1) That it was part of the conspiracy that each was and would remain a member of the German-American Bund; that each was a responsible leader of the Bund.

(2) That some prepared German articles called Bund Commands and others distributed and caused them to be distributed to units of the Bund.

(3) That the commands were read at meetings.

(4) That Command 37 counselled, directed, and urged those to whom its contents were communicated to *evade, resist,* and *refuse* service in the land and naval forces.

(5) That articles in the newspaper "The Free American," published by the Bund, which were distributed, urged German-American citizens and others to *resist, refuse* and *evade* such service.

(6) That the defendants otherwise urged German-American citizens and others to *resist* the provisions of the Act of 1940 and to *evade* service.

The 25 defendants were tried together. One was acquitted. The Government called 68 witnesses and the trial lasted from September 17th to October 19th, 1942. The printed transcript of testimony furnished this court covers just short of 800 pages, and the exhibits offered in evidence run to over 350, some of them containing over 50 pages. The defendants were represented at the trial by appointed counsel as they were not able to employ counsel.

The Government correctly states that the evidence offered by the prosecutor falls into two classes: (1) that touching the German-American Bund and its purposes, which was offered to indicate the motives and purposes for the defendants' statements and actions; and (2) evidence touching specific actions, conduct, and statements tending to show the existence of a conspiracy and the steps taken pursuant to it. The evidence in the first category is overwhelmingly greater in volume than that in the second. Indeed a question arises whether it was not an abuse

of discretion to permit the Government to go, at such inordinate length, into evidence concerning the Bund and its predecessor, the Friends of New Germany, during a period of seven years prior to the inception of the alleged conspiracy; and concerning Bund uniforms and paraphernalia, and pictures and literature in the possession of various defendants.

What we shall characterize as the background evidence may be summarized. The proofs disclose that there existed from some time in the early 1930's a society known as the Friends of New Germany. About 1935 the name was changed to the German-American Bund. After Fritz Kuhn, the leader of the organization, had been arrested and convicted of certain offenses irrelevant to the present case, Kunze, one of the petitioners, became president. At the convention of 1940 a new constitution was adopted; and at some time within the dates specified as covering the conspiracy a synopsis of the structure of the Bund was promulgated. Minutes of the convention of 1940 also were in evidence.

From these documents a conception of the nature and, to some extent, the purposes of the association may be obtained. It was organized on the fuehrer or leadership principle. The president was the leader, and was amenable only to the association in convention assembled. His orders were law unless and until modified or abrogated by a convention. Members were expected to obey his orders. Disobedience involved discipline, or expulsion from the organization. The entire hierarchy of constituent organizations and of officials, national and local, was created by him; and all officials, high and low, held office subject to his pleasure. The constituent organizations consisted of local units, each of which had its leader, and of collateral organizations within a unit, such as an OD division, whose function was to drill in uniform, to police

meetings of members, and perform other similar duties; a youth organization, etc.

The professed purpose of the Bund was to keep alive the German spirit among persons of German blood in the United States. Speeches and literature justify the inference that the Bund endorsed the Nazi movement in Germany and, if it did not actually advocate some such form of government in this country, at least essayed to create public opinion favorable to the Hitler regime and to the German National Socialist State. The Bund was also anti-British and opposed our entering the war on the side of the British; its aim was to keep us neutral and friendly to the new Germany. There is much in literature put out or approved by the Bund concerning "discrimination" against American citizens of German blood and the fight which must be waged against it. There is also much to the effect that the Bund is pursuing lawful aims within the constitutional rights of its members, and that its activities need not be hidden from governmental agencies. There is basis for suspicion of subversive conduct; there is matter offensive to one's sense of loyalty to our Government's policies. There may well be doubt of the organization's hearty support of those policies, but if the Bund and its membership were, prior or subsequent to January 1, 1940, engaged in illegal activities, other than those claimed to prove the charge laid in the indictment, the record is bare of evidence of any such.

The Draft Act was introduced in Congress in June, 1940, was amended September 7 by adding § 8 (i) and as so amended became law September 16, 1940. Prior to September 7 there seems to have been no suggestion by the Bund or its officers that, if passed, the law would not be binding on all and ought not to be obeyed. The oral evidence respecting this period is almost entirely that of Luedtke, former secretary of the Bund, who was a defendant and turned state's evidence.

He states that the Bund and its members always favored a compulsory selective service act. But, he said, they were opposed to the principle of using a draft army to fight against Germany. The Bund feared that the President might use a conscript army by sending it abroad to fight with England, against Germany. The Bund desired this country to maintain neutrality by not having our soldiers go to foreign shores. These views were then shared by many loyal citizens, and some of them were enacted into law by Congress. (See § 3 (e) of the Selective Training and Service Act.)

There is no documentary evidence to contradict this testimony. Nothing appears in the minutes of the national convention held August 31–September 2, 1940, or in the testimony as to its proceedings, with reference to selective service. It is true Luedtke says there was some talk about it, and the stenographer was instructed to omit this from the record; but he does not say that such talk was in any way inconsistent with what he had testified as to the Bund's attitude.

On September 7, while the bill was pending in the House, an amendment was offered, was adopted as offered, and remained in the bill when signed by the President. It is

"8 (i)  It is the expressed policy of the Congress that whenever a vacancy is caused in the employment rolls of any business or industry by reason of induction into the service of the United States of an employee pursuant to the provisions of this Act such vacancy shall not be filled by any person who is a member of the Communist Party or the German-American Bund" (50 U. S. C. App. 308 (i)).

Admittedly Kunze, probably with the approval of other defendants, protested by letter and telegram to members of Congress against the passage of the bill thus amended and to the President against signing it. The Act became

law September 16th. Shortly thereafter Kunze called a meeting of unit leaders, at which many of the defendants were present, including Keegan, the counsel of the Bund. Keegan addressed the meeting and said that there was a constitutional question involved, that members of the Bund had been discriminated against (it is plain this statement applies to § 8 (i)); and they had a right to go to court to establish their rights. Kunze recited his efforts to prevent passage of the bill, said an article was to appear in "Free American" entitled "No rights, no duties" and that the Bund was going to fight the discrimination. He explained that the article would make clear that if American citizens were deprived of their right to work they should not be saddled with the burden of military service. He said the Bund intended to fight this discrimination by a test in court. Neither Keegan nor Kunze suggested that Bund members should resist military service irrespective of what happened in the test case. Luedtke, who is the principal witness as to what occurred at this meeting, said he never heard Keegan, Kunze, or any national leader advise anyone to resist military service, irrespective of the outcome of the test case; that it was the policy of the Bund to get this provision (§ 8 (i)) out of the Act.

The sequel to this meeting was the issue of Bund Command No. 37 on October 1, 1940. (Some 49 such commands were offered in evidence, though none but No. 37 is relied on as containing any statement relevant to the charge.) In this command, one of several subjects dealt with was that of military service. The whole of this section is, according to the translation submitted by the Government:

"4. *Military Service:* On October 16, of this year, all citizens and non-citizens (male) who are of age, but who have not passed their 36th year, must register with the military authorities. This order must be complied with unhesitatingly.

"We represent the standpoint, however, that AN IN-
DUCTION into the MILITARY SERVICE is NOT justi-
fied, in as far it concerns Bund members and American
Germans, *for in the Selective Service Law the citizenship
rights of Bund members and the defenders of Germandom
are unconstitutionally severed!*

"EVERY MAN, if he can, will REFUSE *to do military
duty until this law and all other laws of the country or
the states which confine the citizenship rights of Bund
members* ARE REVOKED!

*"We will fight to establish a precedent in this servile
matter!"* [Emphasis as in original.]

Warner, the translator, a government witness, testified
that the German word "präzedenfall," here translated
"precedent," means "a test case in the legal sense," "a
case which they refer to as a precedent." He further testi-
fied that the German words translated above simply as the
English "if he can" may be fairly taken to mean "if he
can properly do so" or "if he can possibly do so." And he
further agreed that the word "Jeder," which he translated
as "every," might properly be translated as "each."

Thus altered, the phrase would read: "Each man if he
properly can . . . will *refuse* to do military service . . .
until this law etc."

As will be seen from what follows, the Government's
case is really pitched on this command, which it con-
strues as a counsel to *evade* military service. The proof
went to great lengths to show that it reached various unit
leaders, and that they read it or made it available to the
members of their units. The evidence is that each of the
defendants who was a unit leader either read it to some
members of his unit or made it available to them, except
only Schneller.

The Bund held a convention in 1941 but there is no
evidence that selective service was there discussed. It
disbanded in December 1941. There is evidence that the

leaders advised the members to keep together, to meet for singing and social purposes; but no evidence that anything was said about selective service or military service.

If the promulgation or imparting of the contents of Command No. 37, and concurrence in its purpose, is evidence of an intent to counsel *evasion* of military service, the conviction of all the defendants, save Schneller, was justified. But the Government evidently felt that a counsel to register for the draft, thus making one's liability to service, his address, etc., matters of public record, and then, if possible, to *refuse* service, if a supposed discrimination remained effective, could hardly be claimed to be a counsel to *evade*.

This becomes the clearer if we analyze the provisions of § 11 of the Act (50 U. S. C. App. § 311).

It subjects to punishment any person:

(1) who shall knowingly make or be a party to making any *false* registration;

(2) who shall knowingly make or be a party to making any *false* statement as to his or another's fitness or liability for service;

(3) who knowingly *counsels*, aids, or abets another to *evade* registration or service;

(4) who in any manner shall knowingly *fail or neglect to perform any duty required of him by the Act;*

(5) who shall knowingly *hinder or interfere by force or violence* with the administration of the Act;

(6) who shall conspire so to do.

It will be noted that resistance or refusal are nowhere mentioned, except as such refusal would constitute a neglect to perform a duty enjoined by the Act (4) or were accompanied by force or violence (5). On the other hand, there appear in collocation descriptions of two sorts of evasion, false entries (1) and false statements (2) imme-

diately followed by the denunciation of counselling "evasion" (3). Plainly enough the Act distinguishes evasion, a species of fraudulent conduct, from mere neglect of duty and from forcible and violent interference or resistance.

The classification so made corresponds with what "evade" means to the common understanding, and the effort of the draughtsman of the indictment to make evasion the equivalent of refusal or resistance, does violence to such usage as well as to the statute.

"Evade" is defined as, "To escape; to slip away; to take refuge in evasion; to use artifice in avoidance."

"Resist" is defined as, "To withstand; to oppose by physical, mental, or moral power."

"Refuse" is defined as, "To decline to accept; to reject; to decline to submit to or undergo."

Now the surest way of rendering oneself incapable of evading military service, of slipping away or escaping it, is to register. And the Bund command which is at the core of the Government's case enjoins registration in the strongest terms. That accomplished, a refusal to serve may follow when the registrant is to be inducted. But to counsel merely refusal is not made criminal by the Act.

The provisions of § 8 (i) of the Act hardly need animadversion. They speak for themselves. Can it be that criticism, that an effort to eliminate them from the Act, or forthright advice to those discriminated against by those provisions, to register but not, if it can be avoided, to serve, unless those provisions have been sustained by the courts as legal, amount to counselling evasion of service? The belief that validity of the other provisions of the Act depends on the validity of that section may seem foolish to us, but can we say that the other defendants did not believe what the Bund's lawyer told them about that?

Thus the Government, recognizing that the issue and communication of Command No. 37 did not, in itself,

constitute a counselling to evade military service, sought to prove a sinister and undisclosed intent in connection with it to counsel evasion. For this purpose it relied first on the so-called un-American sentiments and statements of the Bund; on articles which appeared in the "Free American" and on proceedings had and speeches made at the 1940 convention. But these evinced nothing bearing on the charge laid in the indictment. At most they were evidence that the defendants, or some of them, were the kind of men who might be inclined to counsel evasion of military service.

In addition, the Government introduced evidence as to statements made by one or other of the defendants at unit meetings or other gatherings of Bund members. It must, in final analysis, sustain the judgment by this evidence.

We think the evidence insufficient to overcome the innocent purport of Command No. 37 and to fasten on those who imparted that command a covert purpose knowingly to counsel evasion of military service. The testimony has been carefully examined. It cannot be quoted *in extenso*. A summary must suffice.

Most, though not all, of the testimony as to oral statements by the defendants refers to occasions between September 16, 1940, the date of the Draft Act, and July 9, 1941. There is nothing of significance after the latter date except what is hereinafter noted. During the period mentioned Command No. 37 was read or made available to members by unit leaders, was to some extent discussed; and, during that period, Kunze, accompanied by some of the national leaders, visited various units and discussed the Act before groups. The testimony, in the main, is directed to what Kunze, Keegan, and unit leaders said on these occasions.

Most of it amounts to this: It was stated that the Act was unfair and discriminatory; that Bund members ought not at the same time be deprived of civil rights and asked

to serve in the armed forces; that they should not be called into the army until the discrimination was abolished; that the Bund would fight the discrimination; that the Bund would take steps to correct the unfairness of the Act; that a lawyer would take care of it; that the Bund would bring a test case if means could be devised to that end; that those who could afford it should refuse military service until the discrimination was removed; that the Bund would try to get this provision out of the Act; that § 8 (i) was unconstitutional; that the members had to register but that it was not thought right to ask them to do so while the discrimination continued, but that they should enlist more or less under protest and wait until their rights were restored to them. One witness testified that Kunze once stated that if the members were not treated right they did not have to bear arms and that the Bund was going to make a test case of this.

Reference should be made to certain specific portions of the testimony. A mail carrier testified that shortly after the Act went into effect he spoke to the defendant Belohlavek at the latter's office in Cleveland. Over objection that the evidence did not go to prove any conspiracy, the court admitted it. The witness stated that he said to Belohlavek:

"Joe, you are in the draft aren't you? He said, 'Yes.' I said, 'What are you going to do if they send you to the other side?' So he said, 'Well,'—it was a vulgar word—'I will run to the other side and fight against them'."

A witness testified that, at a meeting of a German Hiking Club in Buffalo early in 1942, Keegan referred to the fact that two of his sons were in the Army, said he felt sorry about them and, referring to those present, said: "You boys are lucky in a way, you might evade military service because you are foreign-born." When someone asked how and why, Keegan explained: "By claiming being a conscientious objector." The witness went to Kee-

gan afterwards, spoke to him privately and said: "Supposing what would happen to me as a naturalized American citizen if I had tried to evade military service by claiming being a conscientious objector? Well, then, he said, 'You would lose your citizenship.' Well, then, I said, 'Of course, to hell with that'." The witness was inducted into the United States Army.

Throughout the entire testimony this is the only evidence that any defendant, in speaking of the draft or military service, ever by the use of the word "evade," or otherwise, gave any indication of a counselling to anyone to escape military service. Under cross-examination the witness testified that, in answering questions, Keegan had said that the only way anyone could avoid serving was by claiming and proving that he was a conscientious objector.

There is evidence that, at a meeting held before the Act was passed, Klapprott said he would not fight against Germany and also that "the Draft Act would build up an army that would be used against Germany" and that he "would do everything" to prevent the passage of such an Act.

As respects the defendant Knupfer, a witness testified:

"Well, Mr. Knupfer explained that a lot of German people lose their jobs, and in a case like that we should refuse to fight."

But, on cross-examination, the witness qualified his testimony to the following effect:

"Q. And I believe you said something about that if they were not allowed to have jobs then they should not be called upon to fight, is that right? A. That is right.

"Q. And that is really the substance of what he said to you at that meeting, is it not? A. Yes.

.        .        .        .        .

"Q. Did you ever hear Mr. Knupfer suggest to you, or to anyone else in that meeting in your membership group,

that you should not register or that you should evade the Selective Service Act in any way? A. He did not say exactly that we should not, but he came out with the point that on account of the people losing jobs, if we not able to work in this country we should not fight in this country."

The following testimony concerns statements attributed to Kunze:

"Q. Well, now, with particular reference to the subject of Selective Service, did he have anything further to say? A. Well, he said one can always be a conscientious objector.

.          .          .          .          .

"Q. And he told all of you that he was going to be a conscientious objector? A. I did not say that he was going to be but he said that it would be wise to be. He said 'You always can become a conscientious objector.' That was his wording.

"Q. Then do I understand now that Mr. Kunze never said that he was going to be a conscientious objector, is that so? A. I cannot recall the exact words that he said, but he used that phraseology of conscientious objector."

Again, with respect to a statement of Kunze, it was testified:

"He said that we were discriminated against, the German-Americans, and therefore we should not sign up for the selective service draft, and he also meant that he wanted to make a test case, but he did not say what kind of a test case . . . I asked him what would happen if I would not sign up for a draft. . . . He said he did not know himself, but he is going to make a test case in the East, you see. So I asked him what I should do. He said it was up to the individual if he wants to sign up for the draft."

With respect to the defendant Streuer, a witness testified that he "mentioned" that if "anybody has chances to stay away from it [military service] which naturally

sometimes happens to some people, it is all right for them . . ." The same witness testified that Streuer never told anybody to resist the draft or not to register.

Except for the so-called background evidence pertaining to the general attitude and state of mind of the defendants this is all the significant testimony with respect to any counselling to evade military service. It should be added that practically every witness who testified to statements made at meetings, and to conversations of the various defendants, when asked whether he heard the defendant as to whom he was testifying advocate resistance to military service or evasion of military service, answered that he had never heard any such advice given by the defendant in question.

When it is borne in mind that most of the defendants were so-called unit leaders of small groups scattered from the Atlantic to the Pacific coast, whose contacts with the Bund and national officers consisted in attending annual conventions, reading Bund commands to members of the unit, and attending meetings to which Kunze or other national officers came, it becomes plain how little evidence there is in the record to convict them of a nation-wide conspiracy to counsel evasion of the draft. In essence, the case made by the Government amounts to this: That these men were partisans of Germany; were against our going to war with Germany, and might be disposed, therefore, to counsel evasion of military service, and were all familiar with Bund Command No. 37.

That the Government, in the last analysis, relied, to make its case, upon the promulgation of Bund Command No. 37, and that the trial judge so understood, seems plain from his charge to the jury, to which exception was taken and which was assigned as error. In that he said:

"There have been numerous references in the evidence and in the arguments of counsel to a test case said to have been proposed by the defendants or some of them to de-

termine the validity of Section 308 (i) of the Selective Service and Training Act which states amongst other things that it is the policy of Congress that Bund members be not employed to fill vacancies created by men in employment being drafted into the armed service. I charge you that if you should believe from the evidence that the defendants, *or any of them,* proposed to test this law by conspiring to counsel someone to *violate* the law, then the fact that their purpose was to make a test case is no defense to the charge here presented against them. I repeat that the offense with which these defendants are charged is a conspiracy to counsel others to evade service in the armed forces of the United States, and such an offense would be complete, if as a fact the defendants did unlawfully and knowingly conspire, combine or confederate together to counsel others to evade such service, and this is true even if defendants had a bona fide honest intent to make a test case. For if there was a *conspiracy amongst these defendants, or any of them, having as its object the violation* of the Selective Service Law, knowingly, the reason for such violation is immaterial to you in your consideration of the question of their guilt or innocence." (Italics supplied.)

Here the honesty and the bona fides of the defendants is said to be immaterial; the fact that they desired to test the constitutionality of the law is said to be immaterial. Nowhere is it stated that Bund Command No. 37, without more, does not amount to counselling to evade military service. Mingled with instructions that innocent motives were no excuse, and the intention to test the constitutionality of the law was no excuse, are statements that these are not excuses where there is a conspiracy knowingly to *counsel evasion* of military service. The statements are mutually contradictory. One with innocent motives, who honestly believes a law is unconstitutional and, therefore, not obligatory, may well counsel

that the law shall not be obeyed; that its command shall be resisted until a court shall have held it valid, but this is not knowingly counselling, stealthily and by guile, to evade its command.] Thus having charged that innocent motives and a desire to test the validity of the law were not a defense, the court added:

"In regard to the matter of a test case, I call your attention to the fact that no test case was ever made, nor is there any evidence that any legal action was ever prepared, and the further fact that Bund Order No. 37, by its very language, opposes military service until this and all other laws, State and national, which the Bund considered discriminatory, were repealed.

"Of course, if you believe beyond a reasonable doubt that the defendants, or any of them, knowingly and unlawfully conspired to counsel evasion of the Selective Service Law, and the matter of a test case was merely a subterfuge to divert attention from their real purpose, you should find such defendants guilty as charged."

This final statement seems to mean nothing short of this, when taken in connection with what just preceded it: If defendants had innocent motives they are nonetheless guilty; if they had guilty motives they, of course, are guilty. It is somewhat difficult to see how the jury could reach any other than a verdict of guilty.

From what has been said above it will be seen that we are of opinion, first, that the promulgation and communication of Bund Command No. 37 was not in itself a counsel to evade; second, that the evidence of the general disposition of the petitioners either towards the Government of the United States or towards the Selective Service Act did not make the Command such; third, that the evidence and oral statements of the various petitioners at committee meetings and unit meetings of the Bund did not supply the basis for a finding, beyond a reasonable doubt, of counselling, or intending to counsel, or con-

spiring to counsel, evasion of military service within the meaning of § 11 of the statute. We are of the view, therefore, that, on the case made by the Government, the defendants were entitled to the direction of acquittal, for which they moved.

Other errors in the admission of evidence and in the charge of the court are assigned by the petitioners. The views we have expressed make it unnecessary to pass upon these alleged errors.

The judgment is reversed and the cause is remanded to the District Court for further proceedings in conformity with this opinion.

Mr. Justice Black, concurring.

I wish to add a few words emphasizing certain reasons, among others, which prompt me to concur in the Court's reversal of these judgments on the ground that the evidence was insufficient to support conviction of the defendants.

The prosecution tried to prove that the defendants counseled the members of the Bund to evade the Selectice Service Act. Its case necessarily rested upon the assumption that members of the Bund were subject to the draft under that Act. It follows that if Bund members were not lawfully subject to draft under the Act, no person could be convicted for advising Bund members to this effect. Bund Command No. 37, an indispensable element in the government's case, took the position that Bund members were not subject to draft because "in the Selective Service Law the citizenship rights of the Bund members . . . are unconstitutionally severed." This same crucial question was seasonably raised and urged in the courts below, and is argued here. Since I think the evidence inadequate to support the judgments, I am not compelled to pass on this grave constitutional challenge.

Nevertheless, these defendants' conduct cannot fairly be appraised without an understanding of the statutory provisions against which they vehemently protested. For testimony as to these protests was a vital part of the evidence against them—without that part of the evidence they could not possibly have been convicted. It is necessary to distinguish between honest objections directed at legitimate wrongs, and sham protests which only obscure the real purpose. Language and actions of these defendants which is crucial to their convictions must be judged in the light of the fact that it followed passage of the Selective Service Act which contained the following provisions.

Sections 8 (a) (b) of the Selective Service Act, 54 Stat. 885, 890, provides that persons who have been drafted into and honorably discharged from military and naval service shall be accorded high preferential rights in regard to their reemployment by public or by private employers. Congress declared in these sections that such an ex-service man must be restored to his former position as though he had "been on furlough or leave of absence during his period of training and service in the land or naval forces," and that he should be so restored to his former job without loss of seniority or other privileges accorded regular employees. Section 308 (i) of the Act, however, declared that

"It is the expressed policy of the Congress that whenever a vacancy is caused in the employment rolls of any business or industry by reason of induction into the service of the United States of an employee pursuant to the provisions of this Act such vacancy shall not be filled by any person who is a member of the Communist Party or the German-American Bund."

After the passage of this Act, these defendants found themselves in this position. It was announced that Bund members were subject to draft to serve on the battlefront

where they might be seriously injured or lose their lives. They found that the law under which they were said to be subject to draft, commanded employers to reemploy other citizens who had been honorably discharged from the service, but the same law provided that when a Bund member came back after an honorable service, with an honorable discharge, no person anywhere could give him reemployment without violating the express policy of Congress.

It has been argued that these defendants had no legitimate reason to protest against these provisions because they were obviously unconstitutional and amounted to no more than an admonition; but they were an admonition sounded by the highest legislative body of the nation. It has also been suggested that these defendants should have known both that the protested proscriptive provision of the Act was unconstitutional and that Courts would sever it from other parts of the Act leaving Bund members constitutionally subject to draft. But this Court has said that

"The legislature could not thus impose upon laymen, at the peril of criminal prosecution, the duty of severing the statutory provisions and of thus resolving important constitutional questions with respect to the scope of a field of regulation as to which even courts are not yet in accord." *Smith* v. *Cahoon,* 283 U. S. 553, 564.

When we view the conduct of these defendants in all of this setting, their vigorous language appears to have been little, if any, more condemnatory of the discriminatory section of the Selective Service Act than language previously used by this Court with reference to legislation of a similar pattern. The whole tone of their protest was sounded graphically by their expression:

"No Civil Rights—No Military Duty! Draft Exempts Bund Members!" Cf. *Inglis* v. *Trustees of the Sailors*

*Snug Harbour,* 3 Pet. 99, 125, 168, 169. As to legislation having a similar setting, this Court has said:

". . . in the pursuit of happiness all avocations, all honors, all positions, are alike open to every one, and . . . in the protection of these rights all are equal before the law. Any deprivation or suspension of any of these rights for past conduct is punishment, and can be in no otherwise defined. . . . A bill of attainder is a legislative act which inflicts punishment without a judicial trial. . . . These bills are generally directed against individuals by name; but they may be directed against a whole class." *Cummings* v. *Missouri,* 4 Wall. 277, 321–323. See also *Ex parte Garland,* 4 Wall. 333.

I cannot agree that the convictions of these defendants can be sustained on the basis of the evidence presented by the prosecution, weighed along with that section of the Selective Service Act which would stigmatize honorably discharged soldiers as unworthy to hold a job and earn a living.

MR. JUSTICE RUTLEDGE.

I concur in the Court's judgment and in the opinion to the effect that the evidence is insufficient to sustain the conviction. I think that is true whether "evade," as used in § 11 of the Selective Training and Service Act of 1940, means a species of fraudulent conduct or willful refusal or resistance of induction. Without Command No. 37 the case collapses. But one sentence in it bears any possibility of construction as counseling evasion, whether in the sense of refusal or of artifice or fraud. That sentence is conditional, not absolute. The whole command, in my judgment, is no more than vehement protest against § 8 (i), sheer political discussion. More than this is necessary.

MR. CHIEF JUSTICE STONE, dissenting.

MR. JUSTICE REED, MR. JUSTICE DOUGLAS, MR. JUSTICE JACKSON and I think the judgment should be affirmed as

to all the petitioners other than Schneller who is not shown to have participated in the conspiracy.

Petitioners were national and local leaders of the German American Bund, whose membership was made up of persons of German nationality or descent. They have been convicted of a conspiracy to violate § 11 of the Selective Service Act of 1940, 54 Stat. 885, which imposes a criminal penalty on any person "who knowingly counsels, aids, or abets another to evade registration or service in the land or naval forces."

The indictments charge that petitioners and others conspired to distribute among the members of the Bund throughout the country a document known as Bund Order No. 37 "which would counsel, direct and urge those to whom the contents were made known that they should evade, resist, and refuse service in the land or naval forces of the United States." Order No. 37 was ostensibly published as a protest of the Bund against the adoption by Congress of § 8 (i) as an amendment to the Selective Service Act, which declared:

"It is the expressed policy of the Congress that whenever a vacancy is caused in the employment rolls of any business or industry by reason of induction into the service of the United States of an employee pursuant to the provisions of this Act such vacancy shall not be filled by any person who is a member of the Communist Party or the German-American Bund."

Order No. 37 was printed in the German language, and an English translation of it was submitted to the jury. After calling attention to the fact that all citizens who have not passed their thirty-sixth year were required by the Selective Service Act to register, it continued, "This order must be complied with unhesitatingly" and added:

"An induction into the military service is not justified, in as far as it concerns Bund members and American Ger-

mans, for in the Selective Service Law the citizenship rights of Bund members and the defenders of Germandom are unconstitutionally severed!"

It concluded:

"Every man, if he can, will refuse to do military duty until this law and all other laws of the country or the States which confine the citizenship rights of Bund members are revoked!

"We will fight to establish a precedent in this servile matter!"

The only substantial questions for our decision are whether the jury could rightly find from the evidence that Bund Order No. 37 did in fact counsel "another to evade registration or service in the land or naval forces," and whether petitioners' conspiracy to give such advice was in the circumstances unlawful. The contentions are that the conviction cannot be sustained because the advice in Bund Order No. 37, that "every man if he can will refuse to do military duty" until the law offensive to the Bund was repealed, cannot be taken to counsel the evasion of service in the military forces and because the alleged conspiracy was not unlawful since the Bund Order only counselled refusal to do military duty as a means of initiating a case to test the validity of § 8 (i) of the Selective Service Act, which is a lawful purpose.

There is abundant evidence showing a consistent purpose of the Bund and Bund members to promote in the United States the interests of Nazi Germany. It is not denied, and could not be, that there is ample evidence from which the jury could have found that the Bund members, and petitioners in particular, were opposed to war with Germany and hostile to the Selective Service legislation of 1940 because they wished to prevent the raising of an army for a war against Germany. It was the theory of the Government, in presenting its case, that respondents seized upon the proposed legislation, which

became § 8 (i) of the Selective Service Act of 1940, as the ready implement of propaganda and agitation among Bund members and their friends, as a means of hindering and delaying the drafting of an army to fight against Germany. The Government's position is that Bund Order No. 37, which petitioners diligently circulated among Bund members, was the product of the conspiracy, and the means by which petitioners counselled members to evade service in the armed forces.

It seems to be admitted, and indeed it cannot be denied, that the evidence gives support to the Government's contention that petitioners had the inclination and the purpose to persuade Bund members to obstruct the operation of the Selective Service Act, and that Bund Order No. 37 was their chosen means to accomplish that end. But it is insisted that the advice to "refuse to do military duty," given by the distribution of Bund Order No. 37 among Bund members of draft age, was not an incitement to "evade" military service which the statute proscribes. Appealing to the dictionary as the ultimate arbiter of the statutory construction, it is said that "evade" connotes conduct which is fraudulent or characterized by artifice or craft, and suggests the idea of "escaping or slipping away from" as opposed to resistance to or refusal to do military duty, which the Bund order counselled.

If the meaning which the dictionary ascribes to a word standing in isolation is to be deemed controlling in the construction of a statute in which the word appears, it would seem to be of some importance to refer to the Latin derivation of the word "evade" as meaning to go or proceed away from, and to its modern usage, also recognized by the dictionaries, as the synonym of "avoid," or "escape" by effort or by force or by any other means, as well as by artifice, craft or dexterity.[1] As the draftsmen

---

[1] The following are dictionary definitions of the word "evade": Funk & Wagnalls: "To avoid by artifice; elude or get away from by

502

of statutes do not usually limit the application of the chosen word to only some of its common meanings without indicating their purpose to do so, the word, read in its context in the statute, is far more revealing of the legislative purpose than the arbitrary selection of one of its dictionary meanings to the exclusion of others which are equally applicable.

Here the statute shows on its face that the word "evade" is used in § 11 as meaning avoidance of or escape from military service either by the failure or the refusal to perform a duty which would otherwise result in the performance of the service, or by means of fraud, craft, or artifice, in meeting the requirements of the Selective Service Act. Section 11 imposes criminal penalties upon any person "charged . . . with the duty of carrying out any of the provisions of this Act . . . who shall knowingly fail or neglect to perform such duty." But it also imposes penalties upon any such person "who shall knowingly make, or be a party to the making, of any false, improper, or incorrect registration, classification . . . and any person who shall knowingly make, or be a party to the making of, any false statement or certificate . . ." It then provides for a like application of the Act to any person "who *otherwise evades* registration or service in the land or naval forces or any of the requirements of this Act, or who knowingly counsels, aids, or abets another to evade registration or service in the land or naval

craft or force; save oneself from, as an impending evil; as, to evade an argument or a crisis." Webster: "To escape; to slip away . . . to get away from by artifice; to avoid by dexterity, subterfuge or ingenuity . . . to escape or avoid, often by the use of skill, dexterity, or contrivance." Oxford: "To escape by contrivance or artifice from . . . to avoid, save oneself from . . . to elude. Nonce-use: 'go out of. Opposed to invade.' " Century: "To avoid by effort or contrivance; escape from or elude in any way, as by dexterity, artifice, stratagem or address; slip away from; get out of the way of . . . to escape; slip away."

forces or any of the requirements of this Act." (Italics supplied.)

The implication from the use of the phrase "otherwise evades" is plain that the acts of omission or refusal to perform the prescribed duty and acts of ostensible performance by false statements and the like are equally recognized by the statute as modes of evasion of military service or of other requirements of the Act. It is thus clear that the phrase "otherwise evades" was intended to include both types of evasion whether effected by breaches of duty or by false, fraudulent and deceptive acts, either of which, if successful, would result in avoidance of or escape from military service. In addition to all these modes of evasion § 11 penalizes one who otherwise (by any other mode) evades (avoids) service. Thus, on the face of the statute there is no basis for saying that respondents can elude its penalties because they counselled Bund members to evade, i. e., escape or avoid, military service by refusing to perform military duty rather than by false statements, artifices, or stratagem. There is no occasion for giving the word "evade," as used in the statute, a more strained or a narrower meaning than is recognized in its context in § 11, which is also identical with the dictionary definitions.

Such legislative history as there is supports this conclusion. Senator Burke, one of the authors of the bill which became the Selective Service Act of 1940, at the hearings on the bill before the Senate Committee on Military Affairs, stated that the provision of § 11 prohibiting the counselling of evasion, applied "where one urged another not to seek repeal of the law but to refuse to obey it while it remained the law." Hearings, Senate Committee on Military Affairs, 76th Cong., 3rd Sess., p. 156. Section 11 was derived from § 6 of the Selective Draft Act of 1917, 40 Stat. 80, which penalized any person who "evades or aids another to evade the requirements of this Act." In

*Fraina* v. *United States,* 255 F. 28, Fraina was indicted under §§ 37 and 332 of the Criminal Code and of § 6 of the Selective Service Act of 1917 for conspiracy with others to "counsel . . . induce . . . divers persons . . . to evade . . . the requirements of" the Selective Service Act. The Court affirmed a conviction where the jury found that the accused made a speech in order to counsel and induce certain "conscientious objectors" "to refuse to be bound, or refuse to act or accept the law, and refuse to do their duty which is required by this law." Thus, before the adoption of the present Selective Service Act, it was judicially determined that one who refuses to comply with the requirements of the law "evades" the law, and that one who counsels another to refuse to accept the law or to do his duty which is required by the law can be found guilty of inducing him to evade it. We must take it that Congress, in adopting the term "evade" from § 6 of the earlier draft act, and using it in like context in § 11 of the 1940 Act, adopted and confirmed the judicial construction of the term as it appeared in the 1917 Act. *Sessions* v. *Romadka,* 145 U. S. 29, 41–42; *Manhattan Properties* v. *Irving Trust Co.,* 291 U. S. 320, 336; *United States* v. *Elgin, J. & E. R. Co.,* 298 U. S. 492, 500; *Missouri* v. *Ross,* 299 U. S. 72, 75; *Electric Battery Co.* v. *Shimadzu,* 307 U. S. 5, 14.

The conclusion seems inescapable that petitioners, by counselling Bund members to refuse to do military duty, counselled evasion of military service, and that the jury's verdict of violation of § 11 is therefore sustained by the evidence. This is not any the less so because the Bund order counselled members of the Bund to refuse to do military service until § 8 (i) was repealed. Bund Order No. 37 was published and distributed by petitioners after the enactment of § 8 (i) of the Act. Its counsel therefore was to violate the statute by evading military service, notwithstanding the order's suggestion that the refusal to do military duty might cease whenever repeal occurred.

The trial judge instructed the jury, rightly we think, that "bona fide honest intent to make a test case is no defense," saying: "If there was a conspiracy amongst these defendants, or any of them, having as its object the violation of the Selective Service Law, knowingly, the reason for such violation is immaterial to you in your consideration of the question of their guilt or innocence." Plainly one who would assail the validity of a statute in a test case can do so only by violating its provisions, here by knowingly counselling another to evade registration or service in the armed forces. One who thus evaded or counselled evasion of military service could not defend on the ground that he violated the Act in order to test its constitutionality. He nevertheless does the act which the statute prohibits and nonetheless intended to do it even though his purpose was to establish that the statutory prohibition is unconstitutional. There is no freedom to conspire to violate a statute with impunity merely because its constitutionality is doubted. The prohibition of the statute is infringed by the intended act in any case, and the law imposes its sanctions unless the doubt proves to be well founded.

Here petitioners laid no foundation for assailing the validity of § 11 by reason of their doubts of the constitutionality of § 8 (i). No one can urge the unconstitutionality of a statute until he shows that it is applicable to him and that he is injured by it. *Marye* v. *Parsons,* 114 U. S. 325; *Tyler* v. *The Judges,* 179 U. S. 405; *Collins* v. *Texas,* 223 U. S. 288; *Roberts & Schaefer Co.* v. *Emmerson,* 271 U. S. 50, 54, 55; *Utah Power Co.* v. *Pfost,* 286 U. S. 165; *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 324; *Voeller* v. *Neilston Co.,* 311 U. S. 531, 537; *Alabama State Federation of Labor* v. *McAdory, ante,* p. 450. Petitioners introduced no evidence. It does not appear that any of them ever gave up any employment because of their induction into the service of the United States pur-

suant to the Selective Service Act, or that they were ever refused or threatened with refusal of any employment because of their membership in the Bund or the Communist Party. And even though § 8 (i) were to be deemed unconstitutional as applied to petitioners, that would not affect the constitutionality of § 11 or relieve petitioners from the consequences of their violation of § 11. For § 14 (b) of the Act provides "If any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of the Act, and the application of such provision to other persons or circumstances, shall not be affected thereby."

The doctrine of *People* v. *Powell,* 63 N. Y. 88, on which petitioners rely, that a criminal conspiracy to do an act "innocent in itself" not known by the conspirators to be prohibited must be actuated by some corrupt motive other than the intention to do the act which is prohibited and which is the object of the conspiracy, has never been accepted by this Court. To establish violation of § 11 nothing more need be proved than that respondents had in contemplation all the elements of the offense which they conspired to commit. *United States* v. *Mack,* 112 F. 2d 290, 292; cf. *Hamburg-American Steam Packet Co.* v. *United States,* 250 F. 747, 759; *Chadwick* v. *United States,* 141 F. 225, 243. There is no contention that petitioners did not know that the Selective Service Act required those subject to it to do military service. And *People* v. *Powell, supra,* was careful to point out that where the conspiracy is to do an act which is not "innocent in itself" the offense is "complete when the act is intentionally done," irrespective of any actual intention to violate the law. Here the act prohibited was hardly "innocent in itself." The facts found by the jury under instructions of the court constitute plain violation of § 11, and the jury's verdict is supported by the evidence.